IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

DUSTEN A. MAHON,
      Plaintiff,

vs.                         Case No.: 5:17cv181/TKW/EMT

MIKE MOORE, et al.,
      Defendants.
_____/

## REPORT AND RECOMMENDATION

This matter is before the court on Defendants' motion for summary judgment (ECF Nos. 70, 71). Plaintiff responded in opposition to the motion (ECF No. 79). Defendants filed a reply (ECF Nos. 82, 83). Plaintiff also filed a motion for leave to amend and a proposed Fifth Amended Complaint (ECF Nos. 78, 81).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b). Upon consideration of the parties' submissions and the relevant law, the undersigned concludes that Defendants' motion for summary judgment should be granted, and judgment entered in their favor. The undersigned also recommends that Plaintiff's motion to amend be denied.

I.    BACKGROUND

Plaintiff Dusten A. Mahon ("Mahon") commenced this case on July 9, 2017, by filing a civil rights complaint under 42 U.S.C. § 1983 (Complaint, ECF No. 1). At that time, Mahon was an inmate of the Holmes County Jail ("Jail"), proceeding pro se.  He was subsequently transferred to the Florida Department of Corrections, and then released from the FDOC (*see* Notices of Change of Address, ECF Nos. 12, 44).  After Mahon was released, he retained counsel (*see* Notice of Appearance, ECF No. 53).

Presently before the court is Mahon's Fourth Amended Complaint, which is the operative pleading (Fourth Amended Complaint, ECF No. 56).  Mahon names three Defendants:  (1) Mike Moore, Jail Administrator, (2) Mike Raley, former Jail Administrator, and (3) Zachary Neitsch, a former correctional officer at the Jail (*id.* at 2–3).  Mahon claims that Defendants Moore and Raley were deliberately indifferent to his medical needs, in violation of the Eighth Amendment (*id.* at 11–12, 14–15).  Mahon claims that Defendant Neitsch violated his Eighth Amendment rights by failing to protect him from an attack by another inmate (*id.* at 12–13).  Mahon seeks compensatory and punitive damages against Defendants in their individual capacities (*id.* at 15).

On March 26, 2020, Defendants filed a motion for summary judgment with supporting evidentiary materials (Defs.' Mot. Summ. J. and supporting materials, ECF Nos. 70, 71).

On April 23, 2020, Mahon filed a response in opposition to Defendants' motion for summary judgment, with supporting evidentiary materials (ECF No. 79). Mahon contemporaneously filed a Motion for Leave to File Fifth Amended Complaint and proposed Fifth Amended Complaint (ECF No. 78; *see also* ECF No. 81). Mahon seeks leave to amend his Fourth Amended Complaint to add a claim against Defendant Raley (Count IV of the proposed Fifth Amended Complaint) and to add four Defendants, Dr. Kyle Contini, Dr. Samuel Ward, former Jail Administrator Laurie Braxton, and former Sheriff Tim Brown (Counts V, VI, VII, and VIII of the Fifth Amended Complaint) (*see* Mahon's Mot. for Leave to File Fifth Am. Compl., ECF No. 78 at 2–4). Mahon states the proposed Fifth Amended Complaint does not change the claims which are the subject of Defendants' pending motion for summary judgment (*id.* at 4).

On April 30, 2020, Defendants filed a reply to Mahon's response to the motion for summary judgment (ECF No. 82). Defendants filed additional evidentiary materials (ECF No. 83).

Mahon filed supplemental authority for his opposition to summary judgment (ECF No. 84).

Because Mahon asserts that the proposed Fifth Amended Complaint does not changes the claims currently pending against each of the current Defendants, the court will address the motion for summary judgment first, and then address Mahon's motion to amend.

## II.    APPLICABLE LEGAL STANDARDS

### A.    Summary Judgment Standard

To prevail on a motion for summary judgment, the moving party must show that the nonmoving party has no evidence to support his case or present affirmative evidence that the nonmoving party will be unable to prove his case at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party successfully negates an essential element of the nonmoving party's case, the burden shifts to the nonmoving party to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" if the "evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Id.* at 248.  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

To defeat summary judgment, the nonmoving party must show more than the existence of a "metaphysical doubt" regarding the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586.  Speculation or conjecture from a party cannot create a genuine issue of material fact. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).  And "[a] mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004); *see also Celotex Corp.*, 477 U.S. at 324.  The nonmoving party must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  *See Celotex Corp.*, *supra*; *Owen v. Wille*, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file designate specific facts showing that there is a genuine issue for trial); *Hammer v. Slater*, 20 F.3d 1137 (11th Cir. 1994).

Regarding the factual positions asserted by the parties, the court must apply the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> **(1) Supporting Factual Positions**.  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
> . . . .
> **(4) Affidavits or Declarations**. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).  If a fact cannot be presented in a form that would be admissible in evidence, it cannot be used for purposes of summary judgment.  *See Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999); Fed. R. Civ. P. 56(c).

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court will consider the fact undisputed for purposes of the motion for summary judgment.  *See* Fed. R. Civ. P. 56(e)(2).

Evidence presented by the nonmoving party in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him or her.  *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jones v. Cannon*, 174 F. 3d 1271, 1282 (11th Cir. 1999). Nonetheless, the nonmoving party still bears the burden of coming forward with sufficient evidence of every element that he or she must prove.  *See Celotex Corp.*, 477 U.S. at 317.  A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322.

### B.    Qualified Immunity

Defendants assert the defense of qualified immunity (Defs.' Mot. Summ. J. at 2–3, 12–13, 16–31).  That defense completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity protects all but the plainly incompetent or those who knowingly violate federal law; it does not extend to one who knew or reasonably should have known that his or her actions would violate the plaintiff's federal rights.

*See Jones v. Fransen*, 857 F.3d 843, 851 (11th Cir. 2017) (citations and quotation marks omitted). The defense gives government officials "breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. Al–Kidd*, 563 U.S. 731, 743 (2011). In part, this defense recognizes the problems that government officials like correctional officers face in performing their jobs in dynamic and sometimes perilous situations. It is also designed to avoid excessive disruption of government services and to provide a direct way to end insubstantial claims early in the litigation. *See id.*

To receive qualified immunity, a defendant must first prove that he or she was acting within the scope of his or her discretionary authority when the relevant conduct took place. *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013). Once that is shown (and it is unchallenged here), the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate. *Id.* Here, the parties not dispute that all Defendants were acting within the scope of their discretionary authority at the Jail when the events giving rise to Mahon's claim occurred (Defs.' Mot. Summ. J at 12–13, ECF No. 71; Pl.'s Resp. to Defs' Mot. Summ. J. at 17, ECF No. 79).

In resolving questions of qualified immunity, courts engage in a two-pronged inquiry. *See Tolan v. Cotton*, 572 U.S. 650, 655 (2014). "The first asks whether the

facts, taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a federal right. . . . The second . . . asks whether the right in question was 'clearly established' at the time of the violation." *Id.* at 659 (citations, internal quotation marks, and alterations omitted) (first ellipsis in original). The court has discretion to decide which question to address first, *see Pearson v. Callahan*, 555 U.S. 223, 236 (2009), but to survive a qualified immunity defense, the plaintiff must satisfy both showings, *see Jones*, 857 F.3d at 851.

The clearly established law requirement provides government officials with the ability to anticipate what conduct will give rise to liability for a constitutional violation. *See Anderson v. Creighton*, 483 U.S. 635, 646 (1987). To that end, when officials are acting within their discretionary capacity, they "can know that they will not be held personally liable as long as their actions are reasonable in light of current American law." *Id.* "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that **every** 'reasonable official would have understood that what he is doing violates that right.'" *Al-Kidd*, 563 U.S. at 741 (quoting *Anderson*, 483 U.S. at 640) (emphasis added). This imposes an objective standard, and that objective standard is "measured by reference to clearly established law." *Harlow*, 457 U.S. at 818.

Because this objective standard is fundamental to the qualified immunity defense, the district court should determine if the law was clearly established at the time the incident occurred.  As the Supreme Court explained:

> If the law at the time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful . . . .  If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.

*Harlow*, 457 U.S. at 818–19.  In this way, both government officials and citizens are protected.  If the law is not clearly established, then the court should dismiss the case against the government official.  If the law was clearly established, then the claim against the government official should go forward.

Authoritative judicial decisions may "establish broad principles of law" that are clearly applicable to the conduct at issue, and it may also be obvious from "explicit statutory or constitutional statements" that certain conduct is unconstitutional.  *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1209 (11th Cir. 2007); *see also Taylor v. Barkes*, — U.S. —, 135 S. Ct. 2042, 2044 (2015) ("We do not require a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate.").  Furthermore, recognizing that the clearly established law question turns on the law at the time of the incident, the district court

must consider the law "in light of the specific context of the case, not as a broad general proposition . . . ." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In other words, the facts of the case before the court must be materially similar to the facts in the precedent that clearly establishes the deprivation. *See Merricks v. Adkisson*, 785 F.3d 553, 559 (11th Cir. 2015) (citation omitted). To be clearly established, the precedent must give officials clear warning of unconstitutional conduct. *Id.*

In considering the law to do this analysis, the district court should compare the facts of the case before it with the facts of those cases that the non-moving party contends show the clearly established nature of the law. As the Eleventh Circuit has explained:

> For qualified immunity purposes, a pre-existing precedent is materially similar to the circumstances facing the official when the specific circumstances facing the official are enough like the facts in the precedent that no reasonable, similarly situated official could believe that the factual differences between the precedent and the circumstances facing the official might make a difference to the conclusion about whether the official's conduct was lawful or unlawful, in the light of the precedent. Thus, every fact need not be identical. Minor variations in some facts (the precedent lacks arguably significant fact or contains an additional arguably significant fact not in the circumstances now facing the official) might be very important and, therefore, be able to make the circumstances facing an official materially different than the pre-existing precedents, leaving the law applicable—in the circumstances facing the official—not clearly established when the defendant acted.

*Merricks*, 785 F.3d at 559 (internal quotation marks omitted).

The Supreme Court recently observed:

> In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases. The Court has found this necessary both because qualified immunity is important to society as a whole, and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial.

> Today, it is again necessary to reiterate the longstanding principle that "clearly established law" should not be defined at a high level of generality. As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.

*White v. Pauly*, — U.S. —, 137 S. Ct. 548, 551–52 (2017) (multiple citations, some quotation marks, and alterations omitted).

The court cannot consider just any case law to decide if a right was clearly established. Only binding opinions from the United States Supreme Court, the Eleventh Circuit Court of Appeals, and the highest court in the state where the action is filed, can serve as precedent for this analysis. *See McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).

And finally, because § 1983 "requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation," *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam)

(citation omitted), each defendant is entitled to an independent qualified immunity analysis as it relates to his or her actions and omissions. "So [the court] must be careful to evaluate a given defendant's qualified-immunity claim, considering only the actions and omissions in which that particular defendant engaged." *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018).

## C.   Deliberate Indifference to Medical Needs

The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."[1]   "The 'cruel and unusual punishments' standard applies to the conditions of a prisoner's confinement." *Chandler v. Crosby*, 379 F.3d 1278, 1288 (11th Cir.  2004); *see also Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306 (11th Cir. 2009) (explaining that a pre-trial detainee's "rights exist under the due process clause of the Fourteenth Amendment" but "are subject to the same scrutiny as if they had been brought as deliberate indifference claims under the Eighth Amendment").   An Eighth Amendment challenge to the conditions of confinement

---

[1] The parties do not dispute that the Eighth Amendment standards govern claims of denial of medical treatment to pre-trial detainees (*see* Defs' Mot. Summ. J at 13, ECF No. 71; Pl.'s Resp. to Defs' Mot. Summ. J. at 12, ECF No. 79).

has two components:   one objective and the other subjective.   *See Farmer v. Brennan*, 511 U.S. 825, 846 (1994).

First, to satisfy the "objective component," the prisoner must show "an objectively intolerable risk of harm."  *Farmer*, 511 U.S. at 846.  He must show that the challenged conditions were "extreme" and presented an " 'unreasonable risk of serious damage to his future health' or safety."  *Chandler*, 379 F.3d at 1289 (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993).

Second, to satisfy the "subjective component," the prisoner must show that the prison official acted with deliberate indifference.  *Chandler*, 379 F.3d at 1289. A prison official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety."  *Farmer*, 511 U.S. at 837; *see also Brown v. Johnson,* 387 F.3d 1344, 1351 (11th Cir. 2004).  A prison "official may escape liability for known risks 'if [he] responded reasonably to the risk, even if the harm ultimately was not averted.'"  *Chandler*, 379 F.3d at 1290 (quoting *Farmer*, 511 U.S. at 844).  Deliberate indifference requires the defendant to have a subjective "state of mind more blameworthy than negligence," *Farmer*, 511 U.S. at 835, closer to criminal recklessness, *id.* at 839–40.

"Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious

medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *McElligott*, 182 F.3d at 1255; *see also Harris v. Coweta Cty.*, 21 F.3d 388, 393–94 (11th Cir. 1994) ("The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay.  A few hours' delay in receiving medical care for emergency needs such as broken bones and bleeding cuts may constitute deliberate indifference."); *see also Farrow v. West*, 320 F.3d 1235, 1246 (11th Cir. 2003) (a defendant who delays necessary treatment for non-medical reasons may exhibit deliberate indifference); *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) ("[A]n unexplained delay of hours in treating a serious injury states a prima facie case of deliberate indifference.").

"A prisoner bringing a deliberate-indifference claim has a steep hill to climb." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1266 (11th Cir. 2020).  The Eleventh Circuit has held, for instance, that the Constitution does not require that the medical care provided to prisoners be "perfect, the best obtainable, or even very good." *Harris v. Thigpen*, 941 F.2d 1495, 1510 (11th Cir. 1991) (quotation omitted). Rather, "[m]edical treatment violates the [E]ighth [A]mendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be

intolerable to fundamental fairness." *Id.* at 1505 (quotation omitted).  The Eleventh Circuit has also emphasized—as have its sister circuits—that "a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment [fails to] support a claim of cruel and unusual punishment." *Id.*; *accord, e.g., Lamb v. Norwood*, 899 F.3d 1159, 1162 (10th Cir. 2018) ("We have consistently held that prison officials do not act with deliberate indifference when they provide medical treatment even if it is subpar or different from what the inmate wants."); *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014) (en banc) ("[The Eighth Amendment] does not impose upon prison administrators a duty to provide care that is ideal, or of the prisoner's choosing.").

## D.    Failure to Protect

"The Eighth Amendment imposes a duty on prison officials to take reasonable measures to guarantee the safety of the inmates." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting *Farmer*, 511 U.S. at 832 (alterations and quotations omitted).   "Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833 (internal quotation marks and citation

omitted).  Thus, it has long been recognized that "prison officials have a duty to protect prisoners from violence at the hands of other prisoners."  *Id.* (quotation and alteration omitted).  However, "a prison custodian is not the guarantor of a prisoner's safety."  *Purcell v. Toombs Cty.*, 400 F.3d 1313, 1321 (11th Cir. 2005) (quotation omitted).

A prison official violates the Eighth Amendment "when a substantial risk of serious harm, **of which the official is subjectively aware**, exists and the official does not respond reasonably to the risk."  *Carter v. Galloway*, 352 F.3d 1346, 1349 (internal quotation marks omitted) (alterations adopted) (emphasis added); *see also Farmer*, 511 U.S. at 828 ("A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment.").  The three elements of a failure-to-protect claim are (1) a substantial risk of serious harm; (2) the defendant's deliberate indifference to that risk; and (3) a causal connection between the defendant's conduct and the Eighth Amendment violation.  *See Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015).

"When examining the first element—a substantial risk of serious harm—the court uses an objective standard."  *Caldwell*, 748 F.3d at 1099 (citation omitted).  The alleged condition must be "so extreme that it poses an unreasonable risk of serious damage to the prisoner's health or safety."  *Richardson v. Johnson*, 598 F.3d

734, 737 (11th Cir. 2010). Further, there must be a "strong likelihood" of injury, "rather than a mere possibility," before an official's failure to act can constitute deliberate indifference. *Brown*, 894 F.2d at 1537 (quotations omitted).

The second element—deliberate indifference in the context of a failure to prevent harm—has a subjective and an objective component. *See Caldwell*, 748 F.3d at 1099. The subjective component is satisfied by evidence that the official was both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and also drew the inference. *Rodriguez v. Sec'y for Dep't of Corrs.*, 508 F.3d 611, 617 (11th Cir. 2007) (citing *Farmer*, 511 U.S. at 837). The objective component is satisfied by evidence that the official "responded to the known risk in an unreasonable manner, in that he or she knew of ways to reduce the harm but knowingly or recklessly declined to act." *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019) (internal quotation marks and citation omitted).

A prisoner may advance an Eighth Amendment claim for failure to protect under two different theories, a "particularized risk" theory and/or a "dangerous conditions" theory. *See Estate of Owens v. GEO Group, Inc.*, 660 F. App'x 763, 769 (11th Cir. 2016) (unpublished but recognized as persuasive authority). Under the "particularized risk" theory, which is the theory under which Mahon asserts his Eighth Amendment claim, the prisoner may show that he was the target of a specific

threat or danger, and that the defendant was subjectively aware of the individualized danger yet failed to act to alleviate that risk. *See id.* The plaintiff must adduce evidence that the defendant had subjective knowledge of the risk of serious harm to the plaintiff. *See McElligott*, 182 F.3d at 1249–50, 1255.

Constructive knowledge of the risk is insufficient to establish deliberate indifference under the Eighth Amendment. So, where there are multiple defendants who, allegedly, have been deliberately indifferent, "[e]ach individual [d]efendant must be judged separately and on the basis of what that person knows." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008). The knowledge of one defendant may not be imputed to another. Further, the resulting harm may not be determinative; the essential timeframe under analysis is restricted to the time period before the injury has occurred, when the official had knowledge of the substantial risk of harm but chose to act unreasonably. *See Purcell*, 400 F.3d at 1320 (courts "[can]not allow the advantage of hindsight to determine whether conditions of confinement amounted to 'cruel and unusual' punishment"); *see also Brooks*, 800 F.3d at 1302 ("The very fact of an injury may, in some circumstances, be a factor in assessing that ex ante risk, but it cannot be sufficient on its own to prove that a substantial risk existed.").

A prison official may escape liability on a deliberate indifference claim if the official shows, for example, that he did not know of the underlying facts indicating

a sufficiently substantial danger and was thus unaware of a danger, or that he knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent. *See Farmer*, 511 U.S. at 844. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment" and does not give rise to a constitutional violation. *Id.* at 838.

Finally, the plaintiff must show a causal link between the officer's failure to act reasonably and the plaintiff's injury. *Marbury*, 936 F.3d at 1233 (citation omitted). With respect to causation, section 1983 "requires proof of an affirmative causal connection between the actions taken by a particular person under color of state law and the constitutional deprivation." *LaMarca v. Turner*, 995 F.2d 1526, 1538 (11th Cir. 1993) (internal quotation marks omitted). The constitutional deprivation must, in turn, be "a legal cause of [the plaintiff's] injuries." *Williams v. Bennett*, 689 F.2d 1370, 1381 (11th Cir. 1982).

## III.  DELIBERATE INDIFFERENCE CLAIM AGAINST DEFENDANT RALEY

### A.  Material Facts[2]

---

[2] The court takes the facts from the parties' summary judgment materials of record, *see* Fed. R. Civ. P. 56(c); N.D. Fla. Loc. R. 56.1(B), (C), (F), and views them in the light most favorable to Mahon, *see Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993)

The Jail is operated and controlled by the Holmes County Sheriff (Defs' Mot. Summ. J. at 4, ECF No. 71; Pl.'s Resp. to Defs' Mot. Summ. J. at 2, ECF No. 79). On June 10, 2016, Mahon was arrested and held in the Jail as a pre-trial detainee (Defs' Mot. Summ. J. at 5, ECF No. 71; Pl.'s Resp. to Defs' Mot. Summ. J. at 2, ECF No. 79). At the time of Mahon's arrest, he was serving a one-year term of community control imposed on February 10, 2016, which was supervised by the Florida Department of Corrections (*see* FDOC Warrant, ECF No. 70-8 at 14).

Defendant Raley was the Jail Administrator at the time of Mahon's arrest, and served in that capacity until August 10, 2016 (Raley's Answers to Pl.'s First Interrog. No. 1, ECF No. 79-9). According to Jail practice, if an inmate desired medical attention, he could submit a sick-call request to the medical department or declare a medical emergency (Raley Dep. 14:12–21, ECF No. 79-2). At that time (June of 2016), the Jail employed a nurse, Debbie Walsingham, who was present at the Jail eight hours a day, five days a week, and available on an "on-call" basis when she was not at the Jail (Raley Dep. 12:2–4, 12–19). The Jail contracted with a private physician, Dr. Kyle Contini, who came to the Jail once a week and was available on

---

and *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Matters stated as "facts" for purposes of summary judgment may not be the actual facts. *See Montoute v. Carr*, 114 F.3d 181, 182 (11th Cir. 1997).

an "on-call" basis to respond to emergencies or other matters presented to him by the nurse (Raley Dep. 12:15–17, 21–25, 13:12–19).  According to Jail practice, if an emergency arose when the nurse or doctor was not on the premises, the Jail correctional staff notified Emergency Medical Services and followed its advice (Raley Dep. 15:16:19).

The Jail administrator did not review inmate requests for medical attention, either emergent or non-emergent (Raley Dep. 14:24–15:4, ECF No. 79-2).  If an inmate received medical treatment from an outside provider, and the outside provider released the inmate with a recommendation of additional treatment, the Jail's medical staff would "brief" the Jail administrator on the nature and seriousness of the medical condition, and the estimated cost of additional treatment (Raley Dep. 15:20–16:13, 17:19–18:8).  The Jail administrator would then provide this information, as well as the nature of the inmate's criminal charges, to the Sheriff (Raley Dep. 16:6–10, 17:19–18:8, 18:21–19:1).  The Sheriff would decide whether to ask a judge if the inmate could be released (Raley Dep. 16:9–13, 18:3–8, 18:21–19:1).  If the Sheriff decided not to request an inmate's release, the Jail's nurse would process the paperwork to facilitate treatment by an outside provider and notify the Jail administrator of the outside appointment; and the administrator would arrange the inmate's transportation to the appointment (Raley Dep. 16:6–18, 17:2–15,

39:15–40:9).  Decisions as to whether an inmate received medical treatment, from either within the Jail or an outside medical provider, were made by the Jail's medical staff (Raley Dep. 38:25–39:14).

On June 20, 2016, Mahon was struck on his head and face by another inmate, James Curtis Everett (Defs' Mot. Summ. J. at 5, ECF No. 71; Pl.'s Resp. to Defs' Mot. Summ. J. at 2, ECF No. 79).  Mahon's injuries were photographed, an Incident Report was generated, and Everett was criminally prosecuted for the battery (*see* Incident Report, ECF No. 70-2 at 1; Affidavit–Complaint, ECF No. 70-2 at 2–3; Plea, Waiver, and Consent, ECF No. 70-2 at 4–10; Photograph, ECF No. 79-3 at 8).  Nurse Walsingham assessed Mahon's injuries and notified Dr. Contini (Fracture/Sprain Assessment, ECF No. 79-3 at 7, 11).  Mahon told Nurse Walsingham he had fractured the floor of his left eye approximately two years prior (*id.*).  Dr. Contini, ordered a CT scan at an outside medical facility (Radiology Outpatient Order, ECF No. 79-3 at 11).  The Jail's security staff transported Mahon, accompanied by Nurse Walsingham, to Doctors Memorial Hospital, where Mahon received a CT scan of his head and face (Doctors Memorial Hospital records, ECF No. 79-3 at 12–14).  A hospital doctor reviewed the CT scan at 2:27 p.m. and determined that it showed no acute intracranial abnormality, but multiple fractures of the left orbit and maxilla (Report of Dr. John C. Tomberlin, ECF No. 79-3 at 12–

13).   Nurse Walsingham was notified of the CT scan results at approximately 3:09 p.m. (Mahon Dep. 37:21–38:3, ECF No. 79-1; Radiology Outpatient Order, ECF No. 79-2).  At approximately 3:12 p.m., Nurse Walsingham notified Dr. Contini of the CT scan result (*see* Radiology Outpatient Order, ECF No. 79-2).   Nurse Walsingham then immediately notified Raley that Mahon required additional medical treatment (Radiology Outpatient Order, ECF No. 79-2; Raley Dep. 24:12–18, 28:7–14; ECF No. 79-2).   Raley "briefed" the Holmes County Sheriff, Tim Brown (Raley Dep. 24:18–20).  Sheriff Brown directed Raley to contact a Holmes County judge and convey that the Sheriff recommended Mahon's release; and Raley complied with the Sheriff's directive (Raley Dep. 42:18–21, 25:22–26:4, 39:22–40:2).   Judge Powell authorized Mahon's release, and Mahon was released at 3:55 p.m. with a Notice to Appear in court on August 3, 2016 (Notice to Appear, ECF No. 82-3; Holmes County Sheriff's Office Personal Data Sheet for Mahon dated June 20, 2016, ECF No. 79-3 at 10; Raley Dep. 25:14–15, 25:25–26:1, 40:3–5, ECF No. 79-2).  Nurse Walsingham advised Mahon to go to Gulf Coast Medical Center as soon as possible, and she provided Mahon with a CD of the CT scan (Mahon Dep. 39:11–20, 24–25, ECF No. 79-1).

Mahon went to the emergency room of the Gulf Coast Medical Center ("GCMC") and was admitted at 6:54 p.m. (GCMC Emergency Provider Report, ECF

No. 70-12 at 17–42).  Mahon presented with moderate swelling to the left side of his face and complained of a headache, nosebleed, and pain and blurred vision in his left eye (*id.*).  He reported he had past facial surgeries (*id.*).

Mahon received a CT scan of his head and cervical spine (Pl.'s Resp. to Defs.' Mot. Summ. J. at 4, ECF No. 79; GCMC Emergency Provider Report, ECF No. 70-12 at 17–42).  The CT scan of Mahon's head showed the following:  (1) no change from his CT scan earlier that day, (2) no signs of a developing subdural hematoma, (3) normal brain and soft tissues with no mass, no midline shift, and no skull fracture, (4) fractures to his left eye and the left side of the face, (4) gas in the retro orbital region, and (5) soft tissues of the left eye (*id.*).  The CT scan of Mahon's cervical spine was unremarkable (*id.*).  Mahon was treated with an antibiotic (clindamycin phosphate IV), electrolytes (IV), pain medication (hydromorphone and morphine sulfate, IV), anti-nausea medication (ondansetron, IV), an anti-inflammatory (methylprednisolone, IV), a sedative (alprazolam, single dose), and an analgesic (acetaminophen, single dose) (*id.*).

Mahon was discharged from GCMC at 11:00 p.m. with a diagnosis of maxillary fracture, medial orbital wall fracture, orbital floor (blow-out) closed fracture, possible orbital muscle entrapment, swelling of left side of face, and traumatic ecchymosis of the face (Pl.'s Resp. to Defs.' Mot. Summ. J. at 4, ECF No.

79; GCMC Emergency Provider Report, ECF No. 70-12 at 17–42).  Mahon was

instructed to see Dr. Beggs, a maxillofacial ENT surgeon at 8:30 a.m. the next

morning (*id.*).  Mahon was also provided pain medication (Percocet), an antibiotic

(clindamycin), and an antihistamine (Zyrtec) (*id.*).

The next day, June 21, 2016, Mahon was seen by Dr. Beggs at the Gulf Coast

Facial Plastics & E.N.T. Center (Pl.'s Resp. to Defs.' Mot. Summ. J. at 4, ECF No.

79; Report of Dr. Beggs, ECF No. 70-12 at 48–52).  Dr. Beggs noted a black eye

and orbital "step off" (*id.*).  He also noted that Mahon's extra ocular muscles

appeared intact, his primary gaze was aligned, and his vision was intact (*id.*).  Dr.

Beggs diagnosed Mahon with an open, complex fracture of malar and maxillary

bones (*id.*).  Dr. Beggs performed surgery at the Bay Medical Center three days

later, on June 24, 2016 (Pl.'s Resp. to Defs.' Mot. Summ. J. at 4–5, ECF No. 79;

Report of Dr. Beggs, ECF No. 70-12 at 48–52).  Dr. Beggs implanted two metal

plates into the left side of Mahon's face (*id.* at 43–44).  At a follow-up visit on June

28, 2016, Dr. Beggs noted that Mahon was doing well and healing nicely (*id.* at 45).

### B.    Discussion

Viewing the facts in the light most favorable to Mahon, no reasonable juror

could conclude that former Administrator Raley was deliberately indifferent to

Mahon's medical needs on June 20, 2016.[3]  Mahon has not demonstrated a genuine factual dispute that Raley learned of Mahon's need for additional treatment at approximately 3:13 p.m.; that he immediately discussed the matter with the Sheriff; that he followed the Sheriff's directive to contact a judge; that a judge authorized Mahon's release; and that Mahon was released from the Jail at 3:55 p.m..  First, there is no genuine factual dispute that Judge Powell, not Raley, ordered Mahon's release. Further, there is no evidence that the one-hour (approximately) delay, from the time Raley learned of Mahon's need for additional treatment to the time Mahon was released, was due to deliberate indifference on Raley's part.  And there is no genuine factual dispute that the additional three-hour delay, from the time Mahon was released from the Jail to the time he was seen in the emergency room at the GCMC, was not attributable to Raley.

Moreover, in Mahon's discussion of his constitutional claim against Raley, he does not identify or argue any clearly established law (as that term is defined for purposes of qualified immunity) which placed Raley on fair notice that his conduct

---

[3] Mahon concedes that Raley was not the Jail administrator in December of 2016 (when, as explained *infra*, Mahon was again arrested and incarcerated at the Jail) and thus was not responsible for facilitating Mahon's appointment with an outside medical provider at that time, as Mahon initially alleged in his Fourth Amended Complaint (Pl.'s Resp. to Defs' Mot. Summ. J. at 18, ECF No. 79).

was unconstitutional (*see* Pl.'s Resp. to Defs.' Mot. Summ. J. at 18–20).  Mahon

cites Judge Barkett's concurrence in part in *Marsh v. Butler Cty., Ala.*, 268 F.3d

1014, 1058 (11th Cir. 2001) in support of his claim (*see* Pl.'s Notice of Suppl.

Authority at 2, ECF No. 83).  But as previously discussed, only binding opinions

from the United States Supreme Court, the Eleventh Circuit Court of Appeals, and

the highest court in the state where the action is filed, can serve as precedent for the

qualified immunity analysis.  *See McClish*, 483 F.3d at 1237.  Judge Barkett's

concurrence does not qualify as precedent under that standard.  And even if it did, it

did not place Raley on fair notice that his conduct violated the Constitution.  Judge

Barkett opined, "where, as here, the serious medical need is known by the officials,

**is created by the officials' conduct**, and the inmate is released **in an unreasonable**

**manner where he has little or no chance of obtaining his prescribed treatment**,

there is the deprivation of a constitutional right."  268 F.3d at 1059.  Here, Raley did

not create Mahon's need for medical treatment.  More importantly, Mahon had as

much a chance of obtaining additional treatment after his release as he did in Jail

—if not more—as demonstrated by the medical evidence demonstrating that he

sought and received treatment at the GCMC without any difficulty.

Mahon has not satisfied his burden of demonstrating that Defendant Raley is not entitled to qualified immunity. Therefore, Raley is entitled to summary judgment in his favor.

## IV.    FAILURE TO PROTECT CLAIM AGAINST DEFENDANT NEITSCH

### A.    Material Facts

On August 22, 2016, Mahon was again arrested for violating his community control supervision (Defs.' Mot. Summ. J. at 6, ECF No. 71; Pl.'s Resp. to Defs.' Motion Summ. J. at 5, ECF No. 79; FDOC Warrant, ECF No. 70-8 at 14). Mahon was booked into the Jail at 12:39 p.m. (Holmes County Sheriff's Office Booking Sheet, ECF No. 70-8 at 11). Mahon was sleeping on the floor of A-pod and awoke to see Inmate Everett (who had attacked Mahon on June 16) standing inside the pod, beating on the window, and saying, "You idiot. This is a lawsuit. He's on my paperwork" (Mahon Dep. 43:10–22, 44:21–25, 45:3–5, ECF No. 79-1). Defendant Officer Neitsch stood at the window and laughed (Mahon Dep. 43:18–19, 44:21–25). Mahon stood up and put both hands in front of his face in a boxing stance to protect his face (Mahon Dep. 45:20–21, 46:1–16). Inmate Everett "popped" Mahon two or three times on the right side of his face (Mahon Dep. 47:9–13). Mahon ran to the door of the pod (Mahon Dep. 47:17–18). Defendant Neitsch said, "Aw, did he hit you in the face?" (Mahon Dep. 47:17–19, 47:25–48:2). Neitsch put the key

in the cell door to unlock it as another officer, Officer Moore (not Defendant
Administrator Moore), came down the hallway to provide Neitsch with back-up
(Mahon Dep. 47:22–48:2, ECF No. 79-1).  Mahon kicked the door open, ran down
the hallway and locked the hallway door behind him (Mahon Dep. 48:2–4).  Mahon
then locked two more hallway doors and ran into the Jail lobby (Mahon Dep. 48:6–
9).  Mahon went into a holding cell at the front of the Jail and closed the door (Mahon
Dep. 49:3–4).  Mahon states Officer Neitsch photographed Mahon's injuries, wrote
an incident report, and ascertained that Mahon wished to press charges (Mahon Dep.
50:22–25, 51:4–6).  There is no documentary evidence that this second attack by
Inmate Everett occurred (Defs' Mot. Summ. J. at 6, ECF No. 71).  Mahon did not
file an inmate request/grievance concerning the incident, nor did he request medical
attention (*id.*).  Mahon was released from the Jail three days later, on August 25,
2016, upon the court's dismissing the VOP warrant (Order Dismissing Warrant, ECF
No. 79-5 at 5; Holmes County Sheriff's Office Booking Sheet, ECF No. 70-8 at 11).

## B.    Discussion

Mahon contends Defendant Neitsch "allowed" Inmate Everett to assault him
(Pl.'s Resp. to Defs.' Mot. Summ. J. at 29, ECF No. 79).  To the extent Mahon
proceeds on a failure-to-protect theory, Defendant Neitsch has shown that Mahon
has no evidence to support his claim.

As previously discussed, Mahon must proffer evidence that Neitsch was subjectively aware of the individualized danger that Inmate Everett posed to Mahon. *See McElligott*, 182 F.3d at 1249–50, 1255.  There is no evidence that Neitsch was subjectively aware that Everett had attacked Mahon two months prior.  In Mahon's proposed Fifth Amended Complaint, which is addressed *infra*, he argues that because the Jail is small (a maximum capacity of 131 inmates), it would be unreasonable to conclude that Defendant Neitsch did not know of the prior incident between Mahon and Inmate Everett (*see* Proposed Fifth Amended Complaint at 10).  But as previously discussed, constructive knowledge of the risk is insufficient to establish deliberate indifference under the Eighth Amendment.  *See Burnette*, 533 F.3d at 1331 ("Each individual Defendant must be judged separately and on the basis of what that person knows.").  And allegations of "knew or should have known" are insufficient to satisfy the subjective element of the deliberate indifference standard. *Franklin v. Curry*, 738 F.3d 1246, 1250 (11th Cir. 2013).  Actual knowledge is required.  *Id.*

Additionally, there is no evidence from which a factfinder could reasonably conclude that on the day of the attack (the day Mahon was booked into the Jail), Defendant Neitsch was subjectively aware that Inmate Everett posed a substantial risk of serious harm to Mahon.  When Neitsch placed Everett in A-pod, Mahon was

asleep on the floor.  Mahon awoke when Everett started beating on the window of

the pod, holding up paperwork to the window, and saying, "You idiot.  This is a

lawsuit.  He's on my paperwork."[4]  Defendant Neitsch stood at the window and

laughed.  Mahon stood up and put both hands in front of his face in a boxing stance.

Obviously, Neitsch then knew that Mahon faced a substantial risk of harm.  But to

show an Eighth Amendment violation, there must be evidence that Neitsch

responded to the risk in an objectively unreasonable manner.  Inmate Everett

"popped" Mahon in the face two or three times, and Mahon darted around Everett

and ran to the door.  Defendant Neitsch said, "Aw, did he hit you in the face?"; but

Mahon admits that Neitsch also put the key in the cell door to unlock it, and another

officer (officer Moore) came down the hallway to provide Neitsch with back-up.  To

the extent Mahon suggests Neitsch should have opened the cell door sooner, it is

entirely unreasonable to argue that a lone officer should open a cell containing

numerous inmates and attempt to break up a fight by himself without back-up from

another officer.  And while Neitsch's comment was certainly unsympathetic, his

---

[4] During Mahon's deposition, he described events that preceded Everett's coming into A-pod, including statements Everett allegedly made to Defendant Neitsch during his escort from E-pod to A-pod (*see* Mahon Dep. 44:12–18, ECF No. 79-1).  But this evidence may not be considered on summary judgment, because it is not based upon Mahon's personal knowledge.  Mahon does not allege he was present or within earshot of the alleged conversation; in fact, Mahon admits he was asleep in A-pod, and awoke only **after** Everett was already inside the pod.

conduct in opening the cell door was a reasonable response that obviated any risk of further harm.

Mahon has not carried his burden of demonstrating that the facts, viewed in his favor, show that Officer Neitsch's conduct on August 22, 2016, violated Mahon's clearly established Eighth Amendment rights. Therefore, Defendant Neitsch is entitled to summary judgment in his favor.

## V.    DELIBERATE INDIFFERENCE CLAIM AGAINST DEFENDANT MOORE

### A.    Material Facts

After Mahon was released from the Jail on August 25, 2016, he began losing his vision "for about six to eight hours every night." (Mahon Dep. 47:14–15, 50:2–3, ECF No. 79-1). Mahon went to the Eye Center of North Florida on September 19, 2016, and October 19, 2016, where he was diagnosed with visual disturbance (decreased peripheral vision and sensitivity) in his left eye secondary to trauma (*see* medical records, ECF No. 79-7). The Eye Center referred Mahon to the Mullis Eye Institute for evaluation, and scheduled an appointment with Dr. Robinson at the Mullis Eye Institute for December 15, 2016 (*id.*). Eight days prior to that date (on December 7, 2016), Mahon was again arrested for violating his community control supervision and detained in the Jail (Defs.' Mot. Summ. J. at 6, ECF No. 71; Holmes

County Sheriff's Office Booking Sheet, ECF No. 70-8 at 7; Warrant, ECF No. 70-8 at 8–9). At the time of booking, Mahon signed a Medical Information and Consent Form acknowledging he was instructed that if he had a medical problem, he must describe it in detail on a sick call request form and give it to the nurse (Holmes County Jail Medical Information and Consent Form, ECF No. 70-13 at 4). Mahon also completed a medical assessment form in which he listed "broke face," "optical," and "nerve in eye" in the "Injuries" section of the form (Holmes County Jail Medical Assessment Form, ECF No. 79-6 at 3). In the space provided for stating medical concerns, Mahon listed "lower back pain, ankles & knee, left side face pain and going blind, tooth (illegible)" (*id.*). Mahon listed the following medications: Percocet, Adderall, and Restasis (*id.*).

Neither Defendant Raley nor Defendant Moore was the Jail Administrator in December of 2016; Laurie Braxton was the Administrator (*see* Raley Dep. 5:23–6:4, 36:10–11, ECF No. 79-2; Moore Dep. 5:18–21, ECF No. 79-8). Dr. Contini was still the Jail's contract doctor (*see* Medical Administration Record, ECF No. 79-6 at 4). Mahon's wife came to the Sheriff's Office and spoke to Raley about Mahon's missing a medical appointment (Raley Dep. 35:19–36:5, ECF No. 79-2). Raley informed Mrs. Mahon that if Mahon scheduled an appointment prior to his incarceration, he must submit a request to the Jail's doctor for a determination of

medical necessity (Raley Dep. 35:19–36:9, 38:25–39:14).  Raley suggested that Mrs. Mahon contact Administrator Braxton about the missed appointment (*id.*).

On December 21, 2016, Mahon filed an inmate grievance, but he did not request medical attention and instead requested only that Officer Neitsch stop shining his flashlight in his cell (Inmate Request, ECF No. 70-8 at 15).  Also in December, Mahon filed a request to be moved to the "Trustee Pod" so he could work (Inmate Request, ECF No. 70-2 at 13).  There is no evidence that Mahon requested medical attention for his eyes.

Defendant Moore became the Jail Administrator on January 1, 2017 (Moore Dep. 5:18–21, 11:22–12:3, ECF No. 79-8).  The Sheriff changed from Sheriff Brown to Sheriff Tate (Moore Dep. 7:22–23, 9:21).  And the Jail's contract doctor changed from Dr. Contini to Dr. Ward (*see* Medication Administration Record for January of 2017, ECF No. 79-6 at 6).

As with Sheriff Brown and Administrator Raley's tenure, during Administrator Moore's tenure, it was the Jail's policy that all appointments with outside medical providers first be approved and scheduled by the Jail's medical staff (the contract doctor and the Jail's nurse), and then the security staff would coordinate the transportation (Moore Dep. 15:5–16:2, 16:21–18:15, 22:12–25, 23:11–24:3, 24:8–18, ECF No. 79-8).  If an outside medical provider recommended treatment for

an inmate, the Jail's nurse would advise the contract doctor, and the doctor would assess the necessity of the treatment (Moore Dep. 15:5–16:2).  If the Jail's medical staff determined that outside treatment was necessary, the medical department would coordinate the appointment with the outside provider and coordinate with Moore regarding security and transportation (Moore Dep. 15:5–16:2, 22:12–21).   An inmate's family member could also initiate the process of obtaining treatment for an inmate from an outside medical provider (*see* Moore Dep. 16:21–18:15).  The family member would be required to contact the Jail's medical department, which would then evaluate the request (*id.*).  If the medical staff deemed the treatment medically necessary, the medical staff would make the appointment with the outside provider and coordinate with Moore regarding security and transportation (*id.*).  For security reasons (flight/escape risk), the inmate's family was not informed of the date or time of the outside appointment (Moore Dep. 34:20–35:5, 40:22–25).

If the Jail's medical staff (the nurse and the contract doctor) determined that an inmate needed outside medical treatment, Moore did not override that decision (Moore Dep. 40:5–12, 42:8–13, ECF No. 79-8).  If the outside treatment was estimated to cost "a great deal of money," Moore would notify the Sheriff, and there may be further discussions about possible alternatives, but an inmate would not be

denied medical treatment because of cost (Moore Dep. 22:22–25, 23:11–24:3, 24:8–18; 41:6–13).

On January 10, 2017, Mahon fell and hit the left side of his face (*see* Holmes County Jail Incident Report and attached Witness Statement, ECF No. 79-6 at 8–9). The Jail transported Mahon to the emergency room at Doctors Memorial Hospital (Doctors Memorial Hospital records, ECF No. 79-6 at 10–22). Mahon received x-rays, which indicated no apparent acute injury (*id.*). Dr. Bailey diagnosed Mahon with a contusion to his left cheek with no apparent new fractures (*id.*). Mahon was discharged with instructions to follow up with the Jail doctor for hypertension (*id.*).

On January 12, 2017, Mahon was transported by the Jail to the Mullis Eye Institute for an examination (Mullis Eye Institute Comprehensive Exam, ECF No. 79-6 at 32). Mahon was transported there again on February 2, 2017, for an appointment with Dr. Robinson (Mullis Eye Institute records, ECF No. 79-6 at 30–31). Dr. Robinson noted Mahon's visual field of his right eye was within normal limits with "many false positives" (*id.* at 31). With respect to Mahon's left eye, Dr. Robinson noted Mahon's repaired malar and maxillary fracture (*id.*). Dr. Robinson diagnosed "classic migraine headache" and a visual defect/disturbance with Mahon's left eye but noted that his eye exam was within normal limits (*id.*). Dr.

Robinson suspected malingering but recommended a consultation with a neurologist (*id.*). Dr. Robinson also prescribed eyeglasses (*id.* at 30–31).

In late January of 2017, Mahon complained to a Jail nurse that wires from the metal plates in his face were becoming exposed (Mahon Dep. 62:10–63:20, ECF No. 79-1). Mahon states the nurse thought he was joking and laughed (*id.*). Mahon states the wires were exposed on the inside of his mouth and were not outwardly visible (*id.*). Mahon states he complained to "Moore" of pain and swelling in his face, but "Moore" responded that Mahon would not receive additional pain medication beyond the ibuprofen he was prescribed (Mahon Dep. 64:3–7). Mahon did not clarify whether he was referring to Defendant Administrator Moore or Randall Moore, a correctional officer at the Jail (*see* Raley Dep. 30:10–20, ECF No. 79-2; Moore Dep. 36:7–37:24). Administrator Moore denied that he had, or would have had, such a conversation with Mahon (Moore Dep. 36:7–37:24). Mahon's medical records document his prescription for 800mg of ibuprofen twice daily (Medication Administration Records, ECF No. 79-6 at 6, 25, 27, 29, 44, 46, 49, 50). In January and February of 2017, Mahon also received Gabapentin (for nerve pain) and Restasis eye drops (*id.* at 6, 29). In February, he also received medication for migraines (Imitrex) (*id.* at 29).

On February 18, 2017, Mahon submitted a medical request asking if he could see a dentist, plastic surgeon, and "The Neuro, Brain & Spine Center" regarding his face injury (Medical Request, ECF No. 79-6 at 33). Mahon complained, "My teeth are killing me & my eyeball is in great pain" (*id*.). A nurse administered Mahon's medications on February 20, 21, and 22, noting that Mahon was resting on the floor of the cell and took his medication without any difficulty (Medical Progress Notes, ECF No. 79-6 at 34). On February 23, 2017, an officer offered Mahon his medication, but Mahon refused (*id.*). A nurse returned to the cell an hour later to offer the medication again (*id.*). Mahon complained he was "hurting bad" (*id.*). The nurse explained that refusing his medication would cause his pain to worsen, but Mahon still refused to take it (*id.*).

Mahon's inmate file contains a note from his wife dated March 18, 2017, stating she scheduled an appointment for Mahon with Dr. Beggs, the plastic surgeon who performed Mahon's reconstructive surgery in June of 2016 (handwritten note, ECF No. 79-6 at 35). Mrs. Mahon indicated she scheduled the appointment for "Monday at 10:35" (apparently March 20, which was two days after she wrote the note) and asked that she be contacted if she needed to reschedule the appointment (*id.*). Administrator Moore was aware that Mrs. Mahon had scheduled appointments for Mahon with outside medical providers, and Moore advised both Mahon and his

wife that appointments with outside medical providers must be coordinated through the Jail's medical department (Moore Dep. 17:1–9, 17:18–23, 40:15–41:5, 42:17–43:3, ECF No. 79-8).

On March 27, 2017, Mahon submitted a medical request complaining of pain, burning, and a "hole" in his arm from a spider bite or a staph infection (Medical Request, ECF No. 70-13 at 1). Mahon was seen by a nurse the same day (*id.*). The doctor prescribed an antibiotic, Clindamycin 300 mg, three times daily for ten days (*id.*).

On April 23, 2017, Mahon submitted a medical request stating the teeth in his upper left jaw needed to be removed and his left eye needed surgery (Medical Request, ECF No. 79-6 at 36). Dr. Ward saw Mahon the next day (*see* medical record dated April 24, 2017, ECF No. 79-6 at 37). Dr. Ward assessed Mahon with a toothache, pain in his left eye, vertigo, and gastroesophageal reflux disease (GERD), and noted that Mahon "wants to have sx [surgery] on face" (*id.*). Dr. Ward prescribed medication for the vertigo (Meclizine, 25mg every 8 hours for 2 weeks) and ordered that Mahon be provided milk with his medications (to help with the reflux) (*id.*). Dr. Ward's treatment plan also included "Records eval. for sx [surgery] if needed" and "eye referral if needed" (*id.*).

Mahon's medical records show that Mahon's prescription for ibuprofen (800mg twice daily) continued throughout his incarceration (Medication Administration Records, ECF No. 79-6 at 4, 6, 25, 27, 29, 44, 46, 49, 50). He was prescribed and received additional medication for the GERD (Ranitidine, 50mg twice daily) (*id.* at 37, 44, 46, 49, 50). His psychiatric medication changed from Lamictal to Quetiapine (*id.* at 4, 6, 29, 37, 44, 46, 49, 50).

On May 11, 2017, Mahon submitted an inmate request to Defendant Moore complaining, "My face is killing me" and requesting surgery and pain medication (Inmate Request, ECF No. 79-6 at 38). Moore instructed Mahon to sign up for sick call (*id.*).

On May 12, 2017, Mahon sent another request to Defendant Moore for surgery and treatment for his face (Inmate Request, ECF No. 79-6 at 39). Moore again instructed Mahon to sign up for sick call (*id.*).

On June 7, 2017, Mahon began kicking on the cell door complaining that his mouth hurt, and demanding that the Captain and nurse respond (Incident Report, ECF No. 79-6 at 40).[5] Mahon was placed in administrative confinement and charged with Disrespect to Officials (*see id* at 40, 43). Following a disciplinary hearing

---

[5] Mahon submitted a copy of the Incident Report and disciplinary decision with his Response to Defendants' Motion for Summary Judgment (*see* ECF No. 79-6 at 40, 43).

before Sergeant Segers, Mahon was placed in disciplinary confinement for thirty days and lost thirty days of gain time (Results of Charges by Disciplinary Hearing Officer, ECF No. 79-6 at 43). Defendant Moore approved the disciplinary decision (*id.*).

On June 8, 2017, Mahon submitted an inmate request complaining he was being denied an appointment with his plastic surgeon (Inmate Request, ECF No. 79-6 at 41–42). Defendant Moore responded that Mahon failed to indicate to whom he was directing his request and failed to attach all of the necessary copies of the request (*id.*).

Mahon commenced this § 1983 lawsuit by filing his initial Complaint on July 9, 2017 (Complaint, ECF No. 1).

On July 26, 2017, Mahon was seen by Nurse Howell for his complaint of upper jaw pain from a wire (Chronological Record of Health Care, ECF No. 79-6 at 45). Mahon requested Oragel (oral pain relief) and salt, and Nurse Howell provided it (*id.*).

On July 29, 2017, Officer Young filed an Incident Report stating that Inmate Donnie Grover reported that Mahon attempted to persuade other inmates to assist him in his lawsuit by contaminating his eye drops with bleach and helping him administer the eye drops to himself (Incident Report, ECF No. 70-2 at 23). Inmate

Groover also reported to Officer Young that Mahon was selling his medication to other inmates in the pod (*id.*). Donnie Groover provided a sworn witness statement stating he bought medication from Mahon several times; that Mahon sells his other medications; and that Mahon had been putting bleach in his eyes (Witness Statement of Donnie Groover, ECF No. 70-2 at 25). Sergeant Segers investigated the allegations and charged Mahon with disciplinary infractions (*see* report of Sergeant Segers, ECF No. 70-2 at 26–27).

On July 31, 2017, Mahon was seen by Nurse Howell for his complaint of difficulty seeing out of his left eye (Chronological Record of Health Care, ECF No. 79-6 at 45). Nurse Howell observed that Mahon's eye was slightly red and swollen (*id.*). Nurse Howell conducted a vision screening and noted that Mahon could not read the 20/100 line of the eye chart, stating it was blurry (*id.*). Nurse Howell noted she would talk to Defendant Moore about the issue (*id.*).

On August 5, 2017, Mahon was seen by Nurse Howell for a follow-up examination of his left eye (Chronological Record of Health Care, ECF No. 79-6 at 45). Nurse Howell noted that Mahon squinted a lot even though his eye was clear with no redness or swelling (*id.*). Nurse Howell noted she would continue to monitor Mahon's condition and that he had no complaints (*id.*).

On August 8, 2017, Mahon inquired of Nurse Howell if a doctor appointment had been scheduled (Chronological Record of Health Care, ECF No. 79-6 at 45). Nurse Howell responded that Mahon's eye looked better, but she would continue to monitor it and speak with Defendant Moore (*id.*).

On August 9, 2017, Nurse Howell noted that Mahon's eye was clear with no swelling, and that Mahon had no complaints (Chronological Record of Health Care, ECF No. 79-6 at 45). Nurse Howell noted she would continue to monitor Mahon's eye (*id.*).

On August 10, 2017, Defendant Moore met with Mahon, in the presence of Nurse Howell and Sergeant Segers, regarding the investigation of the disciplinary charges (handwritten report of M. Moore, ECF No. 79-6 at 47).[6]  Moore informed Mahon that he was being placed in "lock down" in the front of the Jail because an investigation revealed he was intentionally attempting to harm himself by putting bleach in his eyes, and he continued to complain of headaches but was stockpiling and selling the prescription ibuprofen he was receiving (*id.*).  Moore also addressed Mahon's accusation that he was not receiving medical treatment because he was not allowed to attend appointments with outside medical providers that his wife had

---

[6] Mahon submitted a copy of Defendant Moore's handwritten report with his Response to Defendants' Motion for Summary Judgment (*see* ECF No. 79-6 at 47–48).

scheduled (*id.*).  Moore advised Mahon that his present detention involved charges for which he could receive prison time, and that transporting him outside the Jail for the four back-to-back doctor appointments his wife had scheduled presented a serious security risk (*id.*).  Moore advised Mahon that he had also informed Mrs. Mahon of this (*id.*).  Moore informed Mahon that he had been observing Mahon without Mahon's knowledge, and Moore observed that Mahon did not hold his eye closed or otherwise indicate he had a problem with his eye unless he was in the presence of medical staff or in the courtroom in the presence of the judge (*id.*). Finally, Moore reminded Mahon that he must submit all three copies of each inmate request form, or staff would not respond to the request (*id.* at 48).  Mahon filed inmate requests appealing the disciplinary decision (Inmate Requests, ECF No. 70-2 at 32–33).

Mahon admitted he stored six 800mg ibuprofen pills in a hot cocoa mix pouch instead of taking them when the nurse administered them (Mahon Dep. 124:21–125:2, 125:11–16, 126:2–4, ECF No. 79-1).

On August 14, 2017, Nurse Howell noted that Mahon's eye was clear with no swelling, and Mahon was still squinting even though he had no complaints (Chronological Record of Health Care, ECF No. 79-6 at 45).  Nurse Howell noted she would continue to monitor Mahon's eye (*id.*).

On August 15, 2017, Nurse Howell conducted an eye examination (Chronological Record of Health Care, ECF No. 79-6 at 45). Nurse Howell noted Mahon stated he could not read the top line of the eye chart (20/100) at all and stated, "I get dizzy when I look out of it." (*id.*).

On August 24, 2017, Mahon was seen by Nurse Howell for a complaint of aching in his right knee (Holmes County Jail Medical Progress Note, ECF No. 70-8 at 3). Mahon requested an Ace bandage (*id.*). The nurse noted no swelling and that Mahon was able to walk well (*id.*). The nurse provided Mahon with an Ace bandage and two 200mg tablets of Motrin, and advised Mahon to submit another sick call request if he had future problems (*id.*).

On October 26, 2017, Mahon was released from the Jail to the Florida Department of Corrections (Holmes County Sheriff's Office Booking Sheet, ECF No. 79-6 at 52).

## B.    Discussion

Viewing the facts in the light most favorable to Mahon, no reasonable juror could conclude that Administrator Moore was deliberately indifferent to Mahon's medical needs from January 1, 2017 to October 26, 2017. Mahon faults Administrator Moore for not following through with the outside medical provider's recommendation in January of 2017 (specifically, Dr. Robinson with the Mullis Eye

Institute) that Mahon receive a consultation with a neurologist and prescription eyeglasses.  However,  there is no evidence that the Jail's medical staff determined that Mahon had a serious need for either a neurological evaluation or prescription glasses.

Additionally, there is no evidence that Moore withheld, denied, or delayed treatment with respect to an eye/vision problem or face and mouth pain.  With respect to Mahon's alleged vision problem, there is no evidence that the Jail's medical staff ordered treatment that Moore failed to provide.  When Mahon saw Dr. Ward for complaints of a vision problem in April of 2017, Dr. Ward's treatment plan included "eye referral if needed" (ECF No. 79-6 at 37).  Thereafter, the Jail nurse addressed Mahon's complaints of vision problems by examining his eye, testing his vision, and regularly monitoring his condition.  There is no evidence that either Dr. Ward or the nurse determined that additional treatment was necessary or notified Moore that additional treatment was necessary.

With respect to Mahon's face and mouth pain, the undisputed evidence shows that the Jail's medical staff prescribed pain medication for Mahon (800mg of

ibuprofen twice a day), and Mahon received it on a largely consistent basis.[7]  When

Mahon saw Dr. Ward for complaints of face pain in April of 2017, Dr. Ward's

treatment plan included "Records eval. [evaluation] for sx [surgery] if needed" (ECF

No. 79-6 at 37).  There is no evidence that Administrator Moore was aware that

action was required by him or the security staff.  In the absence of a clear directive

from the medical staff, Moore's failure to provide additional treatment for Mahon's

face and mouth pain did not constitute deliberate indifference.  *See Keith v. DeKalb*

*Cty., Ga.*, 749 F.3d 1034, 1050 (11th Cir. 2014)  (holding that the law does not

require non-medical jail officials to ignore the determination and recommendation

of medical staff).  Moreover, Mahon has not demonstrated that it was clearly

established in 2017 that a jail administrator has a constitutional obligation to

disregard the medical expertise of the jail's medical staff and medical contractors

who have been hired to ensure that inmates' medical needs are tended to.  *See id.*

Mahon has not satisfied his burden of demonstrating that Defendant Moore is

not entitled to qualified immunity.  Therefore, Moore is entitled to summary

judgment in his favor.

---

[7] Mahon's Medication Administration Records for January and February of 2017 suggest
that some doses may been missed (*see* ECF No. 79-6 at 4, 25, 27, 29), but there is no evidence that
the omissions were known by, let alone attributable to, Administrator Moore.

## VI.    MAHON'S MOTION TO AMEND

As discussed *supra*, Mahon seeks leave to amend his Fourth Amended Complaint to add a claim against Defendant Raley (Count IV of the proposed Fifth Amended Complaint) and to add four Defendants, Dr. Contini, Dr. Ward, former Jail Administrator Braxton, and Sheriff Brown) (Counts V, VI, VII, and VIII of the Fifth Amended Complaint (*see* Mahon's Mot. for Leave to File Fifth Am. Compl., ECF No. 78 at 2–4).

Because this is not Mahon's first amendment, he may amend only with Defendants' written consent or the court's leave. Fed. R. Civ. P. 15(a)(1)–(2). There is no evidence of Defendants' written consent to the amendment; in fact, Mahon admits they oppose it (*see* Pl.'s Mot. for Leave to File Fifth Amend. Compl. at 5); therefore, Mahon may amend only with the court's permission.

Rule 15 provides that the court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The Supreme Court set forth the following standard for a court's grant or denial of a party's motion to amend:

> Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded. *See generally*, 3 Moore, Federal Practice (2d ed. 1948), 15.08, 15.10. If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant,

> repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'  Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Foman v. Davis*, 371 U.S. 178, 182 (1962).  For the following reasons, the undersigned concludes that amendment of Mahon's pleading would be futile.

With regard to Defendant Raley, Mahon concedes Raley is entitled to summary judgment on Count I of the Fourth Amended Complaint, because discovery revealed that Raley was not the Jail Administrator in December of 2016 (*see* Pl.'s Resp. to Defs.' Mot. Summ. J. at 18, ECF No. 79).  In the proposed Fifth Amended Complaint, Mahon seeks to add a claim of deliberate indifference against Raley based upon the fact that Mahon was released from the Jail on June 24, 2016, instead of being provided additional medical treatment after Inmate Everett assaulted him that day (*see* Proposed Fifth Amend. Compl. at 13–14, ECF No. 81).  Mahon also seeks to add Dr. Contini and Sheriff Brown as Defendants, based upon the fact that Mahon was released instead of being provided additional medical treatment after the assault by Everett (*see id.* at 14–15, 17–18).

For the reasons discussed *supra* in Section IV, neither Administrator Raley nor Sheriff Brown nor Dr. Contini created Mahon's need for medical treatment; instead, the need was created entirely by a spontaneous, unanticipated attack by Inmate Everett.  Further, as Mahon concedes, the decision to release Mahon was made by a judge, not Raley, Sheriff Brown, or Dr. Contini (*see* Pl.'s Mot. to File Fifth Amend. Compl. at 3).  Moreover, Mahon had as much chance of obtaining additional treatment after his release from the Jail as he did in Jail, as demonstrated by the medical evidence demonstrating that he sought and received treatment at the GCMC without any difficulty.  Mahon's adding a claim of deliberate indifference against Administrator Raley, Sheriff Brown, or Dr. Contini would be futile. Therefore, Mahon is not entitled to amend his complaint in these respects.

Mahon also seeks to add a claim of deliberate indifference against Laurie Braxton, the Jail Administrator in December of 2016, based upon the fact that Mahon missed an appointment at the Mullis Eye Institute on December 15, which Mahon had scheduled on October 19 (prior to his re-arrest on December 7) (*see* Proposed Fifth Amend. Compl. at 16–17, ECF No. 81).  As previously discussed, there is no genuine dispute that neither Mahon nor his wife followed the proper channels for obtaining his attendance at **this** appointment (i.e., submitting a request to the Jail's medical staff for their approval and obtaining their approval).  And it is

undisputed that Mahon attended an appointment with the same outside provider a month later.  Mahon cannot state a plausible claim of deliberate indifference against Administrator Braxton based upon the missed appointment in December of 2016.

Mahon seeks to add a claim of deliberate indifference against Dr. Ward based upon his alleged refusal to allow Mahon to receive treatment from outside medical providers for his left eye and face from January of 2017 to October 26, 2017 (*see* Proposed Fifth Amend. Compl. at 15–16, ECF No. 81).  Mahon alleges he would not be blind in his left eye and suffer from severe migraines if Dr. Ward had provided treatment for his left eye and face (*id.*).

Again, as previously discussed, there is no genuine dispute that on February 2, 2017, when Dr. Ward was the Jail's contract physician, Mahon was examined by a specialist, Dr. Robinson at the Mullis Eye Institute (*see* ECF No. 79-6 at 30–31).  Dr. Robinson noted Mahon's visual field of his right eye was within normal limits with "many false positives" (*id.* at 31).  With respect to Mahon's left eye, Dr. Robinson noted Mahon's repaired malar and maxillary fracture (*id.*).  Dr. Robinson diagnosed "classic migraine headache" and a visual defect/disturbance with Mahon's left eye but noted that his eye exam was within normal limits (*id.*).  Dr. Robinson suspected malingering but recommended a consultation with a neurologist (*id.*).  Dr. Robinson also prescribed eyeglasses (*id.* at 30–31).  Considering Dr.

Robinson's findings that Mahon's eye exam was within normal limits with respect to both eyes, and Robinson's suspicion that Mahon was malingering, Dr. Ward's failure to refer Mahon to a neurologist was not a case of deliberate indifference. *See Harris*, 941 F.2d at 1505; *accord, e.g., Lamb*, 899 F.3d at 1163 (holding that "disagreement alone" does not constitute deliberate indifference).

In March, Mahon's wife notified the Jail (on a Saturday) that she had scheduled an appointment for Mahon with a plastic surgeon two days later. But there is no evidence that Dr. Ward subjectively knew about either the appointment or Mahon's need for medical treatment at that time.

On April 23, 2017, Mahon submitted a sick call request, and Dr. Ward saw him the next day. Dr. Ward noted Mahon's complaints of vertigo, pain in his left eye, toothache, esophageal reflux, and Mahon's stated need for surgery (*see* ECF No. 79-6 at 37). Dr. Ward prescribed medication for the vertigo (Meclizine, 25mg every 8 hours for 2 weeks) and ordered that Mahon be provided milk with his medications (to help with the reflux) (*id.*). Dr. Ward's treatment plan also included "Records eval. for sx [surgery] if needed" and "eye referral if needed" (*id.*). And Mahon continued to receive treatment for pain (800mg of ibuprofen twice daily) and GERD (Ranitidine). The fact that no additional steps were taken to facilitate an evaluation for eye treatment or surgery does not plausibly suggest deliberate

indifference, as opposed to mere negligence, on Dr. Ward's part. As previously explained, deliberate indifference requires the defendant to have a subjective state of mind "more blameworthy than negligence." *Farmer*, 511 U.S. at 835.

In May and June of 2017, Mahon complained to Administrator Moore that he needed medical treatment, and Moore repeatedly told Mahon to request treatment via sick call, but Mahon did not do so. In July, Mahon requested Oragel and salt for jaw pain, and a nurse provided it. In August, a nurse evaluated and monitored Mahon's complaints with respect to his left eye. Thereafter, there is no evidence that Mahon requested medical treatment for his eye or face/mouth.

These facts fail to plausibly suggest that Dr. Ward was deliberately indifferent to Mahon's serious medical needs. Therefore, amendment of the complaint to add claims of deliberate indifference against Dr. Ward would be futile.

## VII.  CONCLUSION

Defendants are entitled to summary judgment in their favor on the claims asserted in Mahon's Fourth Amended Complaint. Mahon should not be permitted to amend his complaint to add a claim against Defendant Raley (based upon the events of June 24, 2016) or to add claims of deliberate indifference against Dr. Contini, Sheriff Brown, former Administrator Braxton, or Dr. Ward. Therefore, Mahon's motion to amend should be denied.

Accordingly, it is respectfully **RECOMMENDED**:

1.    Defendants' motion for summary judgment (ECF No. 71) be

**GRANTED** and judgment entered in Defendants' favor.

2.    Plaintiff's motion to amend (ECF No. 78) be **DENIED**.

At Pensacola, Florida this 1ˢᵗ day of June 2020.


*/s/ Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>. A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**